IN THE MATTER OF DONALD A. PADDOCK, AN ATTORNEY AT LAW.

Nos. 10651, 10794.
Submitted May 22, 1967. Decided July 26, 1967.
430 P.2d 361.

Forrest H. Anderson, Atty. Gen., Helena, James H. Morrow, Special Asst. Atty. Gen., Bozeman, for the State.

Vernon H. Hoven, Missoula, for respondent attorney.

PER CURIAM:

On September 17, 1963, a complaint alleging unprofessional conduct on the part of Donald A. Paddock, then a duly licensed and practicing attorney in the courts of this state, was filed with this court by one George Borchers. The misconduct alleged had to do with affairs of the Montana Dairymen's Association at a time when Paddock was its attorney. Service of the summons and complaint was obtained upon Paddock in the State of California on October 24, 1963. On November 18, 1963, counsel for Paddock moved this court for an extension of time in which to answer the complaint and was granted to December 3, 1963, for that purpose. On December 2, 1963, an "Objection to Complaint and Motion for Dismissal" was filed. On January 30, 1964, Borchers filed an amended complaint in this cause and answer thereto was filed on March 17, 1964.

This matter is carried as Cause No. 10651 in the records of this court.

On April 29, 1964, a complaint was filed by the Attorney General of Montana against Donald A. Paddock, alleging unprofessional conduct on the part of Paddock in converting a sum of money from an estate while he was employed as attorney for the administrator of the estate, and, secondly, that during the trial of the case Paddock had given false testimony under oath. These allegations resulted from the fact situation and testimony appearing in the district court hearing of the case of Daniels v. Paddock, which was appealed to this court and our Opinion is found in 145 Mont. 207, 399 P.2d 740. Paddock filed his answer to this complaint and the cause is carried as No. 10794 in the records of this court.

On May 13, 1965, pursuant to section 93-2019, R.C.M.1947, this court ordered these matters referred to a referee and appointed Grover C. Schmidt, Jr., Esq., an attorney at law of Fort Benton, Montana, referee, and he took and filed his oath of office with this court. Such referee returned his reports to this court on March 6, 1967, and in order to provide a procedure for further proceedings in the causes the court by orders of March 8, 1967, adopted section IX, Rules of the Commission on Practice of the Supreme Court. In accordance with the provisions of such section the Clerk issued citations which directed that Paddock appear within ten days and file his exceptions to the reports of the referee, or his determination not to do so, as provided in such section. On March 31, 1967, Paddock filed a statement of exceptions on the part of the accused to each report of the referee. On April 25, 1967, the Attorney General filed an answer to each statement.

On April 21, 1967, Paddock submitted his resignation as a practicing member of the bar, purportedly under the provisions of Section X of the Rules of the Commission on Practice of the Supreme Court, in which resignation Paddock stated that he

had failed to re-license himself on April 1, 1966. He also moved that these disciplinary proceedings be terminated.

On April 26, 1967, this court by order noted that these disciplinary proceedings were instituted prior to the creation of the Commission on Practice and had never at any time been referred to such Commission but had been prosecuted by the Attorney General of the State of Montana. The order further stated:

"In order to provide a form of procedure following receipt of the report of the referee this court on March 8, 1967, ordered that Rule IX, Commission on Practice Rules, so far as the same should be applicable, be adopted to cover further proceedings in this matter, and citation as provided under said section was issued by the Clerk of this Court on the 8th day of March, 1967.

"The resignation was tendered under the provisions of Rule X which was not made applicable to this proceeding. However, this Court has carefully examined into the matter and the entire record; and, under Rule X does not find this to be a meritorious situation where the resignation should be accepted, and it is therefore declined.

"Donald A. Paddock is granted ten days from the date hereof to file brief, should he so desire, and if no brief be filed within such period the matter will stand submitted."

On May 22, 1967, this court made the following order:

"In this matter the Court issued an order on April 26, 1967, granting Donald A. Paddock 10 days in which to file brief, if he so desired, and if no brief be filed the matter would stand submitted.

"No brief has been filed and IT IS THEREFORE ORDERED that this matter is submitted for decision this day."

Since that date this court has had these matters under consideration and it should be noted that on or about June 27, 1967, the members of this court received through the United States Mail a booklet entitled "Justice Violated?", authored by

Donald A. Paddock and which is described on the fly leaf as: "A Documented Act of Judicial Incompetence or Malevolence Giving Insight Into the Need for Reform in the Selection of the Judiciary." The foreword is dated May 31, 1967, it purports to be published by Paddock Publishing, Loma Linda, California, copyrighted in 1967 by Donald A. Paddock with this statement: "No part of this book may be reproduced, even for purposes of a review or news broadcast without permission in writing from the publisher."

We shall not reproduce any part of this book but we do comment that it contains thirty pages of single spaced printing; unquestionably written while this court awaited the filing of Paddock's brief.

In cause No. 10651, Paddock excepts to Findings of Fact III, IV, V, VI, VII, VIII and IX of the Report of the Referee. These findings are:

"III. That, while engaged in acting as counsel for the Montana Dairymen's Association, the said Donald A. Paddock representing himself to be the treasurer of the said Association, borrowed from the Western Montana National Bank a total of $3,750.00 in the name of the said Association, all without authority of the said Association.

"IV. That a corporation, known as Darifleet, Inc., of which the said Donald A. Paddock owned the controlling interest received the said $3,750.00.

"V. That, while acting as attorney for the said Association Donald A. Paddock urged the said Association to authorize him and the officers of the Montana Dairymen's Association to negotiate a contract with Lake & Associates (later incorporated as Darifleet, Inc.) for hauling milk for the association, without disclosing to the Association that he had any interest in said Lake & Associates.

"VI. That Donald A. Paddock did not properly organize the corporation, Montana Dairymen's Association, nor properly

instruct the officers thereof in their duties and responsibilities under the laws of Montana.

"VII. That defendant knowingly caused to be filed in the office of the Secretary of State of the State of Montana a copy of the Articles of Incorporation of Montana Dairymen's Association altered in a material respect from the original on file in the office of the County Clerk and Recorder of Lewis and Clark County, Helena, Montana.

"VIII. That the entire record of this cause reveals a lack of awareness upon the part of Donald A. Paddock of his duties and responsibilities as an attorney at law in representing a client.

"IX. That defendant's course of conduct in representing his client, Montana Dairymen's Association, failed to meet the standards of honesty and fair dealing required by law and the Rules of the Supreme Court of Montana with respect to a person admitted to practice law in the State of Montana, and can only be characterized as an instance of an attorney calculating his own gain or profit by engaging in deceitful practices, rather than a proper representation of a client."

In Cause No. 10794 Paddock excepts to Findings of Fact V and VI of the Report of the Referee, which reads:

"V. That from the file and records of said Cause No. 26699 and the records of the Clerk of the District of Missoula County it appears, in effect, that said Paddock while acting as an Attorney at Law in 1956 and 1957 was an attorney for Clarence Daniels and as administrator of the estate of his father, Charles Daniels, and did take and convert from said Daniels the sum of Ten Thousand Five Hundred Forty-six and 04/100 dollars ($10,546.04.).

"VI. That during the trial of said cause No. 26699 the defendant, Donald A. Paddock, while under oath and in response to questions propounded on matters material, testified falsely as to his whereabouts on August 20, 1957; and that defendant's course of conduct both as an attorney at law and as a private

individual in dealing with Clarence S. Daniels and with the Court, failed to meet the standards of fair dealing and honesty required by law and the Rules of the Supreme Court of Montana with respect to a person admitted to practice law in the State of Montana."

Section IX of the Commission on Practice Rules which was adopted to govern procedure in these causes provides that the respondent attorney shall, within 10 days after service upon him of a copy of the report (in this case the report of the referee) file either a statement that he does not wish to file exceptions, or he shall file exceptions to the report which may be supplemented by such portions of the reporter's transcript as he may deem necessary to enable the court to pass on his exceptions. Following receipt of such additional portions of the record as the Attorney General may lodge with the court the respondent attorney has ten days within which to file a brief. In these matters no supplementation of any kind was made to the exceptions by the respondent attorney, nor was any brief filed, in spite of our reference to the filing of a brief in our orders of April 26, 1967, supra. The court waited nearly a month before issuing its order of May 22, 1967, supra, ordering the cases submitted. Every opportunity was afforded respondent attorney under Section IX to point out to the court the testimony and exhibits upon which he relies in support of his exceptions. Apparently it was more important to the respondent attorney here to devote his talents to the preparation of a vindictive and scurrilous booklet for distribution throughout the state than it was to point out to this court those portions of the record which he might contend would sustain his position.

We have carefully examined the records in Causes Nos. 10651 and 10794, and it is our opinion that the Findings of Fact of the Referee in each case is supported by substantial clear and convincing evidence.

By way of illustration we refer to Cause No. 10794 involving

the case of Daniels v. Paddock, previously cited, and to the testimony of Paddock with reference to his dealings with Clarence Daniels. He testified to a conversation with Daniels that took place in his office some time in the Spring of 1957 at which time Daniels sought a loan from Paddock, who declined to make it. Further, that about a week later Daniels returned and Paddock offered to purchase the security at 66¢ on the dollar. He testified this second conversation took place somewhere in the first or second week in May of 1957, and that he gave Daniels ninety days in which to see if he could obtain the money somewhere else. He was then asked this question:

"Q. Now, Mr. Paddock, did you at any time see Mr. Daniels from that point on until the year 1958? A. No, I never did. I never laid eyes on him.

"Q. Now, what, if anything, happened to you then during the summer following this meeting? A. Well, as is my usual custom, I have a home at Seeley Lake and I spent most of my time up there, at which time I began to mysteriously become paralyzed and I was brought into Missoula. I was even having difficulty walking and I couldn't use my hands. I couldn't get things out of my pocket. I couldn't write. And I was taken to the Western Montana Clinic for examination and sent by them to the—Dr. H. Ryle Lewis, a neurologist here in Missoula who suspected a brain tumor. He called Spokane and made arrangements for me to go to Spokane to go to a specialist called 'Link, Landers & Jones' I believe is the name of it. I went to Spokane and I was immobilized for approximately three weeks.

"Q. Well, now, just a minute, Mr. Paddock. You went to Spokane. Now, about what time was that? A. That was on the 11th of August, 1957.

"Q. Were you hospitalized there? A. I was hospitalized for two or three weeks.

"Q. And where? A. In Sacred Heart Hospital.

"Q. That is in Spokane? A. Yes.

66

"Q. Now, then after your hospitalization in the Sacred Heart Hospital from there where did you go? A. A friend of mine chartered an airplane and came and got me and had me loaded on board the airplane after determining from my doctor that it was—wasn't necessary that the treatment continue there and he flew me back to Missoula, and I was put in St. Patrick's hospital in Missoula.

"Q. And what time were you discharged from the St. Patrick's Hospital? A. Oh, sometime towards the middle of September of 1957.

"Q. Now Mr. Paddock, I hand you Defendant's Exhibits 'D' and 'C' [note and mortgage] which are photostats of the originals that have been received in evidence in this cause. Do you know when and where and who handled this matter? A. Robert Skelton handled the entire matter from May through its completion. He took care of all of the negotiations. He drew up the instruments. He prepared and notarized these instruments, and he made his report to me when I was returned to Missoula, to the hospital in Missoula, late in August of 1957. I never saw the instruments until after they were filed.

"Q. Would you recall, Mr. Paddock, about what time that Mr. Skelton came to you in the hospital and made your (his) report? A. I would say approximately the last week of August.

"Q. And you were discharged from the hospital, as I understand it, the later part of September? A. I believe that is right. No, towards the middle somewhere.

"Q. Now, do you recall, Mr. Paddock, if you paid any money to Mr. Libra who is acting as attorney for the Kansas City Life Insurance Company? A. Yes, I did."

Upon cross-examination Mr. Skelton asked him this question:

"Q. All right. Where did that $10,546.04 go after October or September of '58. A. You know, Mr. Skelton, when you made out the papers you did not make them out in behalf of the estate of Charles Daniels, deceased. You made the papers

out from Clarence Daniels to me and my wife. Now, you made those papers out because I wasn't there for four months."

Later during the cross-examination the check book of Mr. Paddock was produced and reference made to a check stub for check No. 1049, indicating a check written to A. L. Libra in the amount of $6,493.59, dated August 20, 1957. A deposit of $6,500 was also noted on the stub and Paddock testified that the entry of the money deposit was in his handwriting and continued:

"The 'A. L. Libra,' the 'date,' and 'carried forward,' and the '$6,493.59' are not in my handwriting.

"Q. Now, Mr. Paddock, this $6,493.59 is not in your handwriting? A. It is not my handwriting. This $6,500.00 is in my handwriting. * * *

"A. I deny filling in that figure of $6,493.59. In other words, I deny writing that check."

Paddock on direct examination testified that Mr. Skelton had authority to draw checks on the account at this time. Counsel for Paddock requested plaintiff's counsel to produce check No. 1049 but such counsel advised they did not have any records other than the check book. Skelton, when called as a witness, testified that he did not believe he had authority to draw checks on Paddock's account at this time, but at other times he did have such authority.

On rebuttal on cross-examination Paddock testified:

"Q. Now, Mr. Paddock, you repeatedly state that you were no where near this transaction and you stayed away deliberately and now that you were sick during the transaction. A. I could be mistaken about the time of the sickness, but I don't believe I was there in spite of Mr. Libra's testimony. I believe that this check was sent to Mr. Libra by mail.

"Q. All right. Now, Mr. Paddock, did you or did you not testify under oath on June 26th at the Missoula Courthouse with your attorney Vern Hoven present and Thomas P. Hen-

dricks representing Mr. Naegeli, didn't you testify on that day—

"THE COURT: Of what year? A. June 26th.

"MR. SKELTON: 1963. A. Yes, I testified on that day on a deposition.

"Q. (By Mr. Skelton) On page 16 thereof, Mr. Paddock, line 2 you stated—

"* * * Clarence was not, however, intoxicated at the time that he came in and signed the mortgage and the assignment.

"MR. HOVEN: Would you let Mr. Paddock read the deposition? A. That's all right. That is correct."

Mr. Libra had testified that he had seen Mr. Paddock in Missoula on Friday, August 16, 1957, and he was asked by Mr. Skelton:

"Q. And he was in his office on that date? A. Yes.

"Q. Did he appear to be in good health or not? A. Yes, as far as I know he was in good health.

"Q. Then would you tell the court the next time that you were in his office and under what circumstances? A. Well, the next time would have been Tuesday, August 20th, the day that we settled and made the final arrangement.

"Q. Now can you recall approximately what time you arrived in Missoula on August 20th. A. Yes, I got into Missoula during the noon hour, probably about 12:30. I had driven in from Polson where I had a hearing in District Court that morning.

"Q. And what time did you come into the office of Mr. Paddock? A. As soon as I had lunch, probably about 1:30.

"Q. And who was present in the office at that time? A. Well, Mr. Paddock had a secretary or receptionist, whose name I do not recall, and you were in the office and Mr. Paddock was in the office.

"Q. Now, who did you speak to when you went in? A. I spoke to the secretary and I told her that I had an appointment

with Paddock and I was to see him and she said 'He was expecting me' and she showed me back to his office.

"Q. Now, when you first went in what took place, do you recall? A. I sat down.

"Q. In Mr. Paddock's office? A. I sat down across from a desk from him, and we went over the general details of this arrangement and then we went over the figures I had written to him on Saturday, August 17th. I have a copy of the letter here in front of me now, and I think it is the same letter previously introduced here as an exhibit, and that letter shows a breakdown of the items of money that I was expected to be paid when I met with him on the 20th.

"Q. And did he make any statement as to the amounts that were related in the letter? A. He agreed to those amounts. They checked out as being correct. The amount that I was paid is the precise amount that I set forth in that letter.

"Q. Now, after that part of the conversation did anything else take place at that time? A. Well, I gave him these papers and we discussed them. As I remember he called you into the office.

"Q. And do you recall what took place while I was in there with you and Mr. Paddock? A. Well, I recall generally that he gave you some instructions, something you were supposed to do for him.

"Q. With relation to what? A. With relation to this matter.

"Q. And do you recall what my response was or what I done or may have said? A. My only recollection is that you took some of these papers with you and went over some place to do something.

"Q. Did I make any notes while I was in there, do you recall? A. I believe you did.

"Q. I show you defendant's Exhibit 'D' and I ask if you recollect anything about that? A. Well, this refers to the transaction here but I have never seen it before. The amount that is shown on here as paid to me of $6,493.59 is the same

amount referred to in this letter and the same amount as the check which was given to me. Other than that this does not mean anything particularly to me.

"Q. Was there any discussion at that time about additional charges to Mr. Daniels, do you recall? A. From me?

"Q. No. For the work that was being done for him by the office? A. No, there was no such discussion with me.

"Q. There wasn't? A. No.

"Q. How long was I in there with you and Mr. Paddock, could you say? A. Oh, five minutes or less. It wasn't very long. I don't think I was in the office over 15 minutes the first time, 15 to 20 minutes at the most.

"Q. Then what happened? A. I left the office.

"Q. And do you recall where I was when you left? A. As I remember correctly you were talking to the secretary when I left. The receptionist room was odd shaped. Her desk was off to one side there, sort of around the corner, if I remember correctly, and you were off there. As I came by I would not have come directly by you, I would have come straight down that corridor. It was an odd arrangement anyway to the waiting room, then down another long corridor before I finally got out of the door.

"Q. Was there anyone else in the building or in the office at the time that you left. A. Clarence Daniels was waiting in the waiting room.

"Q. Did you have any conversation with Clarence at that time? A. Yes. I stopped and chatted with him for two or three minutes.

"Q. Now, while you were in the office with Mr. Paddock, was there anything said, any statement about his health at all? A. None that I recall.

"Q. And what did his general appearance appear to be? A. Certainly nothing out of the ordinary that I can recall. I have known Don for a good number of years and certainly he wasn't any different than I would come to expect him to be.

"Q. Now, approximately what time did you return to the office, do you recall? A. Well, that I don't recall except it would have been late in the afternoon. I had my family with me and we had some things to do around town, and I—my instructions given by Mr. Paddock were to come back late in the afternoon. I don't know if any specific time, but to allow him time enough to complete his arrangements with Clarence.

"Q. Now, what occurred when you were there later in the afternoon? A. Mr. Paddock gave me the check for the Kansas City Life mortgage.

"Q. Did you see him write the check? A. Yes. He wrote it in my presence.

"Q. Do you know on what account he wrote it? A. No, I do not, except that it was an account of his. It was no firm— what I am saying is, is that it was not a corporation account or anything like that. It was his own bank account. He had printed checks if I remember correctly.

"Q. Are you familiar with the handwriting of Mr. Paddock to some degree? A. Yes. I have seen specimens of it. I have some samples of it in my file here. He is a good writer.

"Q. Now, showing you in the exhibit '25' check stub 1049 do you recognize the handwriting in the part that says 'For'?

"MR. HOVEN: Just a minute. We object. We interpose an objection for the record. There is no foundation laid, incompetent, irrelevant and immaterial. A. I don't recognize it anyway.

"THE COURT: Harmless. Overruled. A. There apparently are at least three different handwritings there and I do not— suffice to say none of it is my writing if that is what you had in mind.

"Q. (By Mr. Skelton) As far as you're concerned it was a check and you wouldn't distinctly—couldn't remember whether is was made on this checkbook or any other one, is that correct? A. No, I don't.

"Q. Well, just what took place in the office at that time?

Can you describe that? A. Well, my second trip there was very brief. I don't imagine I was there more than five to ten minutes at the most. My sole recollection of the principal events that happened was giving me the check which I had come to Missoula for to pay off the mortgage. He wrote it out and gave it to me. The amount was correct. I took it back to Thompson Falls with me. I deposited it in the First State Bank in Thompson Falls the next morning and I immediately wrote a check out to Kansas City Life disbursing to them the amount that they had coming, and I wrote a letter of transmittal which is the next paper that appears in my file here.

"Q. Now, do you recall his actually writing the check? Did you see him write the check? A. Yes.

"Q. Would you describe the checkbook that he wrote from to the best of your ability? A. Well, it could have been this one (indicating). He took it out of a desk drawer. He opened it up. He wrote out the check to me and we were having some conversation as it occurred. I had no occasion to examine it or inspect it and I made no notation as to the check. If I had known this was to be a critical feature I would have gone back through my bank records and obtained my deposit slip, if I had filled it out—actually might have indicated the account or the bank number that it was drawn on. I usually indicate the name of the person from whom a check comes as well as the bank number. In this case 93-22, but I don't have that with me so I don't know.

"Q. Well, it wasn't a check book, the kind that you carry in your pocket. A. No. He took it out of the desk drawer. It could have been something like that (indicating). It was similar to this.

"Q. It was similar to this, if not this, is that correct? A. That is correct."

While not accepting this version nor referring to all the testimony in that case with respect to the whereabouts of Paddock on August 20, 1957, these quotations from the record out-

line Paddock's first story that he was ill and not in his office on August 20, 1957, the date Libra testified he received the check from him, and that he, Paddock, did not write the check and that the check must have been written by Skelton.

This trial was had on January 27, 1964, Judge Fall entered his order on February 10, 1964, and the matter was appealed to this court as hereinbefore referred to.

On October 9, 1964, Donald A. Paddock appeared before a notary public in San Bernardino County, California, and made oath that the matters, facts and things set forth in an affidavit of merits were true of his own knowledge. The affidavit of merits was annexed as an exhibit to a complaint filed in this court by him against A. L. Libra, wherein he charged that the said Libra had committed perjury in this trial and by reason of the wilful and malicious perjury Paddock had been injured in his reputation as a lawyer, and judgment in the amount of approximately $42,000 was taken against him. The complaint sought the disbarment of Libra.

On October 12, 1964, Donald A. Paddock appeared before a notary public in San Bernardino County, California, and made oath that the matters, facts and things set forth in an affidavit of merits were true of his own knowledge. This second affidavit of merits was annexed as an exhibit to a complaint filed in this court by him against Robert Skelton, wherein it was charged that the said Skelton perjured himself in testimony on this trial and did suborn perjury and conspired to induce false testimony for the purpose of earning attorney's fees in an otherwise unjustified cause and that by reason of these wilful and malicious actions of Skelton, Paddock had been severely injured in his reputation as an attorney and a judgment in the amount of approximately $42,000 was taken against him. The complaint sought the disbarment of Skelton.

We are not going to set forth all the various sworn to allegations of the affidavit of merits in these two matters, but in

the Libra matter Paddock avers that the testimony of Libra as to the activities on August 20, 1957, and particularly that Paddock wrote the check in his presence is wholly false and malicious; that he, Paddock, was ill and that at approximately 6:30 a. m. on August 20, 1957, he left Missoula for Spokane, arriving there about noon on that day. Further, that Libra maliciously perjured himself with the express purpose of injuring another lawyer.

In the Skelton matter much the same averments are made in the affidavit of merits, but in addition, after quoting considerable testimony, Paddock swears: "The aforegoing testimony of Mr. Libra, as adduced by Mr. Skelton's questioning, is wholly false and malicious and was intended to, and did, cause a judgment in the amount of approximately $42,000.00 to be taken against the complainant for the transaction set forth above, the whole matter being predicated on the idea that complainant was personally present and personally coerced and cheated the said Daniels.

"That the said Skelton and the said Libra, both of whom had reason to know, and did know, that the complainant was not present at that time and place, because the said Libra and the said Skelton were present at that time and place. At the time of trial the said Skelton and the said Libra, with full knowledge of the truth, conspired between them to so frame the testimony as to clearly indicate the complainant was present and did handle the transaction."

Thus, Paddock under oath asserts he was not present on August 20, 1957, in his office in Missoula, and that he did not write the check, even to the extent of charging two members of the bar of this state with perjury for stating otherwise, and sought their disbarment.

Perhaps it would be well at this point to comment that reports and complaints had been received by this court during the year 1962 as to the activities of Mr. Paddock. This court has always sought to quietly but thoroughly investigate any

charges, complaints or reports through a member of the bar for both the protection of the attorney and the public. Because of the information received by the court it was decided to appoint a member of the bar to investigate the situation. In seeking out an attorney for this purpose we selected James W. Morrow, Esq., of Bozeman, Montana, who, as well as having his legal experience had at one time been an agent for the Federal Bureau of Investigation. Mr. Morrow is a respected citizen in his community, bears a fine reputation as a lawyer, and was not personally acquainted with Mr. Paddock, nor did he practice to any extent in the vicinity of Missoula. When the first complaint was filed in 1963 against Mr. Paddock, the Attorney General appointed Mr. Morrow as an assistant for the purpose of investigating the Borcher's matter and prosecuting the same should prosecution be justified.

Also, when the time came to appoint a referee the court gave consideration to selecting an active experienced practitioner of excellent reputation, and who was not acquainted with any of the parties nor with the matters to be submitted to him, and appointed Grover C. Schmidt, Esq., of Fort Benton, Montana.

Throughout the record of the many hearings held before the referee, not once did counsel for Paddock complain of any mistreatment by either the referee or the Assistant Attorney General who prosecuted the hearings.

As one is by now quite aware, one of the most pivotal points made by the respondent attorney was that he did not write the check, and that the stub in the checkbook was not in his handwriting.

At sometime between the year 1964 and 1966 this check came to light for at the hearing before the referee on August 30, 1966, the following occurred:

"Mr. Morrow: Ask counsel for Mr. Paddock to admit State's Exhibit No. 3, same being a check signed by Paddock under date of August 20th, 1957, in the amount of $6,493, payable to

the order of A. L. Libra and drawn on the Western Montana National Bank.

"Mr. Hoven: It may be admitted without objection.

"Mr. Schmidt: Admitted without objection.

"Mr. Morrow: And may it further be stipulated that the signature appearing on the check as D. A. Paddock is the signature of D. A. Paddock.

"Mr. Hoven: So stipulated."

Mr. Paddock at that hearing testified:

"Q. Now Mr. Paddock, specifically the charge here is that the statement that you were not in your office on August 20, 1957, was false. Were you in your office on August 20, 1957? A. I was not.

"Q. You were here when Mr. Libra testified? A. I was.

"Q. Did you see Mr. Libra on August 20, 1957? A. I did not.

"Q. Did you deliver to Mr. Libra a check which has been offered in evidence here of $6,493 and some cents on August 20, 1957? A. I did not deliver him that check that day.

"Q. Handing you the check, is that check in your handwriting? A. Yes, it is. .

"Q. Mr. Paddock, if you know, do you know when you wrote that check out? A. I would judge along about the 15th of August.

"Q. Of 1957? A. Yes. And I had notification from Mr. Libra that he would be in on that day to settle up the deal and I wrote the check and turned it over to my secretary along with a number of other checks. My secretary at that time was Ruth Rosheim."

Ruth Rosheim also testified, stating she lived in Denver, Colorado, that she had met counsel for respondent for the first time the previous evening; that she had been called on the phone by him on Labor Day, September 5th, and had been requested to call Mr. Paddock in California; that she did so and had been requested to make a trip to Helena for the purpose

of testifying. She identified an appointment book as being one she used while working in Paddock's office wherein there were no entries between August 15th and September 9th of 1957. She explained that Mr. Paddock was not in his office from August 12th of 1957 until the time that she quit work, being sometime in September of that year.

Mrs. Rosheim testified about going to Paddock's home with papers to be signed. As to the check, she said Paddock entrusted her with it and told her she was not to relay it until she received some papers for it from Mr. Libra. Further, that she handed the check to Libra sometime following August 15th and she received some instruments that she was to look at to see if they were executed.

At this same time Mr. Skelton, who was then working for Mr. Paddock, was in the office and there was no other secretary. On cross-examination she was unable to recall specifically exactly what the whole matter was about, she stated that after nine years it is difficult to recall specific business items.

It strains the imagination that a lawyer, associated with another lawyer, would entrust the verification of the execution of legal papers and delivery of a $6,000 check to a stenographer in his office rather than to his associate attorney. In the same vein, that a stenographer who left the employment approximately a month after the occasion would, nine years later, on the basis of a day book without entries, testify that Paddock was not in the office on August 20, 1957, and that he had entrusted to her the completion of a matter involving several thousand dollars when he had another lawyer in his office.

Contrast this with the testimony of Mr. Libra and Mr. Skelton, and their supporting exhibits, as to the events of that day. Hereinbefore we have recited by way of illustration concrete proof of the falsity of Paddock and we have not attempted to fully support these two counsel in this opinion, but state for the record that they are fully borne out. Paddock testified that Skelton reported to him about the transactions of August

20, 1957. If the matters had been entrusted to the stenographer to complete, what report could Skelton have made? Of course this was before Paddock changed his story, he was then denying having written the check, but when confronted with the check he then admitted writing it. As one reviews the testimony of Mr. Paddock, as the referee did in this matter, only one conclusion is evident: "The truth is not in him."

The referee recommended that Paddock's name be stricken from the roll of attorneys admitted to practice before this court.

We conclude that Paddock's actions were and are unbecoming to a member of the legal profession. His conduct as disclosed by the records in these causes falls far short of fair dealing and honesty which should be the trade marks of an attorney and they show deceitful practices, false testimony and malpractice involving moral turpitude, and it is ordered that he be disbarred and his name stricken from the roll of attorneys.

A copy of this order shall be served by certified mail upon Donald A. Paddock, and by ordinary mail upon his counsel, the Attorney General of Montana, the Assistant Attorney General who presented the case, the referee, the Chief Judge of the United States District Court of Montana, and the Clerk of the Court of Appeals of the Ninth Circuit.