No. 13542

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

_____

IN THE MATTER OF JOSEPH M. GOLDMAN,
an Attorney and Counselor at law,

Respondent.

_____

Counsel of Record:

For Appellant:

Douglas Allen argued, Great Falls, Montana
Thomas Clary argued, Great Falls, Montana
Arnold Huppert, Livingston, Montana
Neil Ugrin, Great Falls, Montana

For Respondent:

Douglas Drysdale argued, Bozeman, Montana
Robert J. Emmons argued, Great Falls, Montana
Joseph Goldman, Missoula, Montana

_____

Submitted: August 25, 1978

Decided: DEC 8 - 1978

Filed: DEC 8 - 1978

*Thomas J. Kearney*
_____ Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

On September 27, 1976, a citation was issued out of this Court to Joseph Goldman, of Missoula, Montana, an attorney admitted to practice before this Court since 1948, directing Goldman to answer charges leveled against him in a complaint filed on the same date by the Commission on Practice.

The Commission on Practice acts under the aegis of this Court (Order Establishing Commission on Practice, Cause No. 10910, January 5, 1965) for the purpose of receiving, investigating, and reporting on allegations of misconduct of lawyers in the State of Montana.

The complaint against Goldman (hereafter "attorney") stated 11 counts of misconduct by him in the practice of law. He filed his answer on November 12, 1976. He set up 3 defenses: first, he stated the charges as a whole and on their face did not constitute grounds to warrant discipline against him; second, he denied outright the charges of the complaint against him; and, third, he alleged the charges should be dismissed because of unreasonable delay in the filing of the charges, citing that: (1) there were indictments pending against him, (2) charges had been made that he had been engaged in a homicide conspiracy and (3) the lapse of time prevented him from having a fair opportunity to defend.

On September 6, 1977, after proceedings in the usual course before the Commission on Practice, the Commission filed its report, findings and recommendations. The Commission had dismissed the allegations of counts 1, 2 and 9 against the attorney; and sustained in full the charges against him in all other counts. It recommended the attorney be

disbarred from the practice of law in the State of Montana. The report, findings and recommendations were unanimously signed by all members of the Commission.

The report came on for hearing before this Court on August 25, 1978, in camera, with counsel appearing for both the Commission on Practice and the attorney.

Now, having fully considered the arguments of counsel, the said Commission report, findings and recommendations, and the underlying transcript and record, we conclude the report and findings of the Commission should be accepted and adopted by this Court and punishment fixed as hereafter provided. In the paragraphs following, we shall discuss our reasons in detail.

First, we will discuss the counts under which the attorney is charged, the evidence we find in the record with respect to those counts and contentions of the parties with respect to the evidence. Second, we shall discuss the applicable law and our reasons for accepting the report and findings of the Commission. Third, and lastly, we shall fix the punishment and explain our reasons for so doing.

Count Three

Here it is charged the attorney, representing Raymond J. Johns, on January 29, 1971, submitted to the Industrial Accident Board a medical report from Dr. Henry W. Hogan, which was false in that it greatly exaggerated the claimant's degree of disability. It is further alleged the attorney knew of the falsity of the report at the time the report was submitted.

In his answer, the attorney admits he represented Mr. Johns, and that he submitted a report on January 29, 1971

-3-

from Dr. Henry W. Hogan but denies remaining allegations of count 3.

Dr. Hogan testified before the Commission that he examined Johns once on January 26, 1971 in Dr. Hogan's office. Claimant had received a back injury when a large scraper he was operating hit a bump and Johns landed quite hard on the seat. Dr. Hogan's examination revealed that though he could bend forward easily, the claimant had difficulty straightening up; he had pain on percussion over the left lumbrosacral joint, muscle spasm area bilaterally and a decrease of pinprick perception on the left sacral nerve distribution. The rest of the examination was normal. On that basis, Dr. Hogan determined the claimant was suffering from a partially herniated lumbar disc and gave him a 25 percent disability of the body as a whole.

Before the Commission, Dr. Hogan testified the disability was not permanent and that he did not mean to indicate a permanent disability in his report. But Hogan also testified he did not relate to the attorney that in his opinion claimant did not have any permanent disability.

Thereupon, the witness Hogan was confronted with his testimony before the Grand Jury in Lewis and Clark County, on December 10, 1975, where Dr. Hogan had testified claimant did not have any permanent disability, and that he had related this to the attorney. Dr. Hogan said in his Grand Jury testimony that the attorney said, "Well . . . give him something." This was said before the doctor wrote the report, according to the Grand Jury testimony.

At this point, the Chairman of the Commission interrupted the interrogation to state the Commission would consider the Grand Jury testimony as substantive evidence. We will discuss the legal aspects of this ruling further in this opinion.

-4-

The attorney himself testified before the Commission. When asked about the Johns medical report, the attorney testified, "I believe it to be true."

The Commission also called Dr. Walker Schemm, as an expert, who testified that the symptoms contained in the Johns report, that is, stiffness and numbness, which were worse when claimant was inactive, were not typical symptoms for a herniated disc. He also testified in 85 percent of the cases involving a herniated disc, he would expect to find abnormalities on examination such as weakness, or loss of sensation or reflex changes, none of which he found in Dr. Hogan's report.

The evidence is clear the medical report on claimant Johns was materially exaggerated. The conflict in the evidence as to whether the attorney knew of the material misrepresentation was resolved by the Commission in concluding that count 3 had been substantiated. The Commission is supported by substantial evidence in the record. It had a right to view the attorney's credibility on this point in the light of all the other facts and circumstances of the case.

Count Four

This count charges the attorney represented Joe Assiniboine and in the course of that representation, he presented to the Industrial Accident Board a false medical report dated February 27, 1971, written by Dr. Henry W. Hogan and at the time the report was prepared and submitted, the attorney knew the report was false in that it exaggerated and overstated the disability of claimant.

In his answer, attorney admits the representation of Joe Assiniboine, and that he submitted the medical report dated February 27, 1971, written by Dr. Henry W. Hogan, but denies every other charge against him in the count.

-5-

In his testimony before the Commission, Dr. Hogan brought out that he had written 2 medical reports on Joe Assiniboine on October 19, 1970, because two industrial accidents and two carriers were involved. One medical report referred to a disability of the right ankle and the other to a disability of the right knee. With respect to the particular accident of July 10, 1970 for which the attorney was representing claimant, the doctor found claimant had a probable lumbar disc herniation. He found the ankle condition to be subacute with no likely improvement within the next 18 months and the necessity of some surgical intervention in the form of vein stripping. He found him totally incapacitated for usual activities.

Dr. Hogan examined claimant again on February 4, 1971 and wrote his second report on February 27, 1971 on which the charges are based. Again, he found a probable lumbar disc herniation with serious doubt as to whether any treatment, medical or surgical would have a curative effect. He considered claimant permanently disabled and did not know which disc had herniated, though he felt it was high in the lumbar region.

Before the Commission, Dr. Hogan denied he had ever told the attorney claimant Assiniboine was not so badly injured or damaged as his reports indicated.

Again Dr. Hogan was confronted with his testimony before the Grand Jury. There, on December 10, 1975, the doctor had testified that before he had sent his written evaluation over to the attorney, he had talked to the attorney on the telephone, and told him the claimant Assiniboine was not so badly damaged or injured as the report indicated. He further told the attorney that Assiniboine could have worked as a supervisor at his job. The doctor also testified before the Grand Jury that although he had rated Assiniboine as permanently disabled, that this was not true and he

and the attorney had discussed a way of justifying this by relating the alleged permanent disability to the job he liked to do rather than the job he could do. He further testified he felt the diagnosis of a lumbar disc herniation was probably not a true diagnosis.

The attorney, in his testimony, denied he had ever submitted any report from any doctor that was false.

With respect to the Assiniboine claim, Dr. Schemm testified since there was no neurological deficit when Dr. Hogan checked claimant and where basically the patient had complaints of back pain and right ankle pain, the normal course would be, before coming to a final conclusion of herniated disc, to investigate further.

The evidence is conflicting, but its weight sustains the conclusion of the Commission that count 4 had been substantiated.

### Count Five

Here it is alleged that the attorney represented Richard Pearce and on his behalf submitted a false medical report dated February 9, 1972, signed by Dr. Henry W. Hogan. The falsity is alleged to be in the statement that claimant was 30 percent disabled, and incapacitated as a result of migraine headaches. It is further charged the attorney knew the report was false.

The answer of the attorney admits the allegations of count 5 but denies the falsity or knowledge of the falsity.

Dr. Hogan testified before the Commission that claimant Pearce was injured when he was struck alongside the head on December 4, 1970. Dr. Hogan made his report on February 9, 1972. He had not treated claimant Pearce for the injuries immediately after he had sustained them and it was Dr. Hogan's recollection that he had seen Pearce only once. Dr. Hogan's neurological findings were entirely normal with the exception

-7-

of tenderness of the occipital nerve, a common finding with respect to migraine headaches. He reported a history from claimant of episodic events, excruciating headaches which were incapacitating, lasting from 12 hours to 3 days. Dr. Hogan reported a fracture involving the foramen magnum and a chipped fracture in the posterior border of this portion of the skull. He did not have X-rays at the time he reported the chipped fracture. Before the Commission, Dr. Hogan claimed he must have called the X-ray Department of St. Patrick's Hospital in Missoula and gotten such a report from that department, but he had no record of such a telephone call, or any written report respecting X-rays. The only knowledge he had of a chipped fracture was in a letter he had received from the attorney, dated December 1, 1971. Dr. Hogan rated the claimant 30 percent disabled from a medical viewpoint because of his migraine attacks. Dr. Hogan further testified he would relate the migraine headaches to the industrial accident and denied he had ever told the attorney at the time he submitted the report to him, that he could not relate the migraines to the industrial accident.

Again, Dr. Hogan was faced with his testimony before the Grand Jury. From that, it appeared on December 10, 1975, he had told the Grand Jury, although it was stated otherwise in his report, he could not positively relate the migraines to the industrial accident and with respect to the 30 percent incapacity figure, he stated, "it was just a guess. It was better than nothing."

Also the evidence of Dr. Schemm was to the effect that the migraines would not be brought about by trauma or injury; the description of the headaches did not sound like the usual

-8-

description for migraine headaches; he did not think it was logical to assume the patient was disabled because he had such headaches.

The attorney's denial in his testimony before the Commission that he submitted any false medical reports applies to this charge also.

Again, the Commission determined the charge against the attorney with respect to claimant Pearce was substantiated by the evidence. We agree.

Count Six

In count 6 it is charged that the attorney represented Leo F. Staat, and in connection with that representation submitted to the Industrial Accident Board a medical report dated November 10, 1970, signed by Dr. Henry Hogan. It is charged the attorney knew at the time he submitted the document that it was false in that it greatly exaggerated and overstated the amount of disability of claimant, and that the disability, if any, was work related.

In his answer, the attorney admitted representing claimant Staat, and submitting the medical report, but denied every other charge against him.

Dr. Hogan, testifying before the Commission, stated claimant Staat had suffered burn injuries. When he first examined Staat, in October 1970, he found extensive burns and scarring on the right side of the body, but also found weakness, clumsiness, and numbness in the left forearm and deltoid muscles. Dr. Hogan made two reports respecting claimant Staat. In his first report, he indicated the scarring of the right side and the weakness or paralysis on the left side. He testified he made it known to the attorney that the neurological abnormalities on the left was not work-

-9-

related or injury related. Dr. Hogan examined claimant Staat later, and made his report of November 30, 1970 in which he indicated claimant was an ironworker and was unable to carry on in his capacity because of a limp arm and hand weakness and rated him at 50 to 60 percent disabled with the implication the disability was work-related. Dr. Hogan admitted before the Commission that his disability figure included the paralysis which was a major contribution to the disability figure and the work-related disability should have been 25 to 30 percent. He denied indicating to the attorney that there was little, if any, disability related to the work accident.

At this point, Dr. Hogan was again asked about his testimony before the Grand Jury. In that testimony, on December 10, 1975, he had stated there was little if any disability in claimant Staat, relating to the accident; that the 50 to 60 percent disability figure was a fraudulent conclusion and that he had informed the attorney of this.

With respect to claimant Staat, and the medical reports submitted for him, Dr. Schemm testified before the Commission that where a person is injured by an explosion from a tank, as was this claimant, and the person is burned, it would not be medically possible that the burn, in and of itself, would affect the spinal column so as to cause paralysis.

The attorney's testimony before the Commission, as with the other counts, was a general denial that he had knowingly submitted a false report to the Industrial Accident Board; however, the file in the Workers' Compensation Division contained an interoffice communication reporting that the attorney had read over the telephone to James Carden the medical report of Dr. Hogan reflecting Staat.

-10-

The weight of evidence supports the conclusion of the Commission that the attorney was guilty of the charges in count 6.

### Count Seven

In this count, attorney is charged with representing one Clarence W. Petersen and that in connection with his representation submitted to the Industrial Accident Board on April 9, 1971, a false report dated April 1, 1971 signed by Dr. Henry W. Hogan, which alleged claimant was 30 percent disabled and which was false in that the disability was substantially less, was not permanent, and was not attributable to a work-related accident.

In his answer, attorney admits the representation, admits submitting the report, but denies every other charge.

Claimant Petersen had been injured while employed as a heavy equipment operator. He was helping to start a tractor engine by pushing the crank with his right foot which slipped off the crank, so that his foot struck against the ground with great force with his right heel. Dr. Hogan testified the injuries resulted in a tear of the Achilles' tendon and that at the same time, claimant had probably broken off an overgrown arthritic process in his sciatic notch which affected his nerve distribution and gave him pain and discomfort in his legs. His medical report indicated a 30 percent disability which, before the Commission, the doctor contended was work related.

In Dr. Hogan's testimony before the Grand Jury, on December 10, 1975, he had testified with respect to claimant Petersen, that the 30 percent disability figure was highly inflated and that he could not relate the medical problem to the industrial accident. He had also stated in the medical report the condition was permanent, whereas before the Grand Jury, he gave his opinion the condition was not permanent.

-11-

He also told the Grand Jury had he related these facts to the attorney at the time he delivered the medical report.

Neither Dr. Schemm nor the attorney were asked specifically about the Petersen report, but we assume the gene al denial of the attorney that he submitted any false reports would cover the Petersen case also.

The conclusion of the Commission was that the charges on count 7 were sustained. That conclusion is supported by substantial evidence.

Count Eight

This count presents a different factual situation and charge than contained in earlier counts. In count 8, attorney is charged with attempting on or about December 1974 to persuade Patrick McDonald, a client he represented before the Industrial Accident Board, to present to the Workers' Compensation investigators false evidence and testimony with regard to his representation of McDonald in connection with the claim. The specific charges are; (1) that the attorney attempted to get McDonald to tell the investigators the attorney had been contacted by McDonald's wife after McDonald was in the hospital as a result of the industrial accident; (2) McDonald had stopped in the attorney's office, filled out the Workers' Compensation claim form with respect to his injury which happened that day, and then proceeded to the hospital; (3) he importuned his client along this line on several occasions but; (4) subsequently, when the publicity attending the Workers' Compensation investigation increased, he then advised McDonald to tell the truth.

In his answer, the attorney alleged: (1) he represented Patrick McDonald with respect to an industrial accident and that on numerous occasions he was contacted by and he

-12-

did contact Patrick McDonald; (2) that McDonald stopped by his office to fill out the original documents and questionaires submitted to him in connection with the claim; (3) the attorney denies he ever importuned McDonald or any other person to give a materially false statement to such investigators and; (4) denied generally every other allegation of count 8.

Claimant McDonald testified before the Commission that on May 5, 1971 he had fallen from a scaffold while working on an overpass finishing cement. Immediately following the fall, he had gone to the office of the attorney, having first stopped at his own house to pick up his wife. The attorney recommended he go to the emergency room at St. Patrick's Hospital, which claimant did. It appears from other testimony and documentary evidence, the claim forms regarding his accident were mailed out on the same day as the injury was received, and the forms were executed before claimant went to the hospital. Subsequently he received a settlement for his injury. After the completion of his claim, when investigators from the Attorney General's office appeared in Missoula in connection with Workers' Compensation cases, McDonald testified the attorney called him. The attorney was concerned the McDonald claim had been filed on the same day he fell off the bridge and he was further concerned it would look bad if McDonald was injured enough to go to the hospital that he stopped at the lawyer's office first. McDonald then testified the attorney suggested that he report to the investigators that he went directly to the hospital and had his wife contact the attorney and thereafter McDonald had come to see the attorney. McDonald testified

he agreed to do this and that later the attorney contacted him on two or more subsequent occasions to the same effect. On the fourth contact however, the attorney told McDonald to tell the truth. The problem, as McDonald understood it, was that the attorney was worried about the appearance of "ambulance chasing". McDonald did testify to the truth when he appeared before the Grand Jury.

The testimony of the attorney before the Commission on this point was he had received in the mail the forms from investigators which should have been directed to McDonald. He called Mr. Zanto, then head administrator of the Workers' Compensation Division and Zanto advised the attorney the forms should be filled out and sent in. The attorney stated he then mailed the forms to McDonald with instructions he should execute and return them to the investigators. After that, McDonald came to the attorney's office on two occasions and each time refused to fill out the forms, although the attorney urged it should be done. The attorney also testified he told McDonald that in filling out the forms, he should tell the truth.

The Commission, in finding against attorney on this issue, stated the answers of the attorney in his testimony on this point was evasive and unsatisfactory. It appears from the attorney's testimony that on the date McDonald was injured, the attorney did know McDonald had come to him before he had gone to any hospital or sought other medical help and the claim to the Workers' Compensation Division had been filled out before McDonald went to the hospital. It is further undeniable from the testimony, the attorney knew when the investigation commenced that this fact would become

public knowledge and it is quite apparent from the testimony that the attorney was anxious to avoid the possible charge of "ambulance chasing". From those facts it appears quite acceptable that the testimony of McDonald is true that the attorney had importuned him that he tell the investigators he had gone to the hospital first before he got in touch with his attorney. In other words, attorney requested McDonald to give false testimony or false information to the investigators.

Count Ten

This charge relates to the representation by the attorney of Michael Eichenlaub. This count alleges that on February 19, 1970 the attorney submitted to the Industrial Accident Board a report from Dr. Henry W. Hogan dated February 19, 1970 which was false in that it represented the worker, Eichenlaub, was disabled and unable to work when in fact he was attending school and employed part-time. It is also charged that on September 8, 1970, the attorney submitted to the Industrial Accident Board a medical report of Dr. Henry W. Hogan which falsely alleged the condition of Eichenlaub had deteriorated in order to make a second claim for compensation; and the attorney had approached claimant to make such second claim.

The answer of the attorney admits the representation of Eichenlaub and the submission of the Eichenlaub reports, but denies every other allegation of the count.

Claimant Eichenlaub testified before the Commission. He stated he sustained an injury on July 3, 1969 when he was working on a pile construction and was cleaning up underneath a bridge when a rock hit him on the left ankle. He was treated by a doctor with cortisone shots, a cast was applied and he was disabled for some time. Later in the fall of 1969, he was advised by his doctor that he could return to

-15-

work.  There was no construction work available at the time, however, so he worked in his home doing taxidermy.

When Eichenlaub's compensation payments stopped, he went to see the attorney who then began to represent him. He was examined by Dr. Hogan in February 1970 at the suggestion of the attorney.  He described his examination by Dr. Hogan thusly:

> "A.  Well, I sat down on a chair and Mr. Hogan was behind a desk and I took my boot off and elastic bandage and then he checked my foot and checked my reflexes and made me walk at the most I'd say 10 feet or 15 and then back and sit down.  Then we started talking, you know, hunting and fishing and stuff.
>
> "Q.  Before you started talking about hunting and fishing, how much time had elapsed from the time that you first saw Dr. Hogan?  A.  I would say no more than 15, 20 minutes at the most."

At the time, he described his ankle as being tender and "I couldn't do no running or anything like that it would spring it again, but I was walking."

In September 1970, he was examined again by Dr. Hogan in connection with his ankle injury.  A point in issue is whether he came to Dr. Hogan the second time because of a worsened condition or whether he in fact was brought to Dr. Hogan by the attorney, at his instigation.  Claimant Eichenlaub testified the attorney called him, and Eichenlaub then went to see the doctor.  At the time of the call, he was working in his home shop.  The condition of his ankle at that time was no worse than the first time he went to see Dr. Hogan.

The examination by Dr. Hogan was much the same as the first, except the time involved was shorter.  Eichenlaub did not indicate to Dr. Hogan in any way that the condition of his left foot had worsened since he was first examined by Dr. Hogan in February 1970.  Shortly following this examination, he received another $3,000 as a second settlement.

Cross-examination of Eichenlaub revealed his ankle was still disabled some 7 years after the accident. It also developed he had been examined the second time by Dr. Hogan before the college year had started but that it was his intention at the time he was examined to begin his college education when the university opened for the fall quarter.

The attorney, in his testimony before the Commission, stated that Eichenlaub had come to his office on August 18, 1970. There Eichenlaub informed the attorney his ankle was still hurting him, and he had tried to work for 3 days but could not continue working because of the pain and tenderness in his left ankle. The attorney stated that Eichenlaub was wearing an Ace bandage at the time, to give stability to his ankle. The attorney informed Eichenlaub if the condition had become worse, he would be entitled to further settlement from the Industrial Accident Board.

At the time of the first settlement, claimant Eichenlaub was a minor. The attorney testified his father and mother participated in handling the first settlement. In fact, he had them execute an instrument entitled Authority to Attach Funds. In effect, this instrument recites the father and mother, as parents of claimant Eichenlaub, refused to sign a petition for guardianship for the appointment of a guardian for the minor. The reason for refusing to seek the guardianship as given was because of the existence of creditors who could attach the funds of the minor. The instrument contains a hold harmless agreement to the law firm of the attorney from any criticism of any possible nature. There is a recitation that the parents have been advised "very carefully" by the attorney that the funds should be placed in a guardianship estate. The testimony does not indicate clearly the reason for the execution of such an instrument or the wording of its title.

The attorney also testified that Eichenlaub's mother, between the first and second settlements, had talked to him about the injured ankle of claimant and the mother advised

him the boy's foot had gotten worse. He stated the mother had indicated she felt the boy was entitled to more money.

However, Mrs. Myrtle Ann Eichenlaub, mother of the boy, also testified before the Commission. She denied talking to the attorney or making the statements attributed to her by the attorney.

Dr. Hogan's testimony before the Commission was to the effect that upon his first examination of Eichenlaub, he had found continuing signs of tendonitis, post-traumatic, which interfered with his activities and assigned a 30 percent disability. He testified his second examination of Eichenlaub occurred because he received a letter from the attorney, dated August 18, 1970, in which the attorney informed Dr. Hogan, that since the last time he saw Eichenlaub, claimant's complaints were greater than at the time of the first examination. Dr. Hogan examined Eichenlaub on August 18, 1970 and wrote the second report dated September 8, 1970, in which he stated the tendonitis was serious enough to rate Eichenlaub 40 to 50 percent disabled, considering his body as a whole; that Eichenlaub hoped to attend college but the doctor did not see how claimant could ambulate around the campus and that his foot and ankle were considerably worsened over their conditions in February 1970. Dr. Hogan did not recall Eichenlaub had told him the ankle was much worse, but he relied on the statement and letter of the attorney for that fact.

Dr. Schemm, in his testimony before the Commission, questioned the value of the medical reports in that the diagnoses of tendonitis are orthopedic matters, and he did not think Dr. Hogan, a neurologist, would logically be able to decide this kind of disability.

The Commission found the charges on count 10 had been substantiated. The evidence speaks out loudly and clearly in support of that finding.

Count Eleven

This count differs from the other charges against the attorney, because in this count, a pattern of activity is charged against the attorney in that he, knowing Dr. Henry Hogan was in severe financial distress, and addicted to drugs, sought and obtained from Dr. Hogan a series of medical reports which were false in their conclusions. They were false because: (1) claimant was not disabled but the medical report indicated he was, or (2) the disability was not work related by Dr. Hogan indicated it was, or (3) the extend of disability was exaggerated and over-rated. It is also alleged this pattern was part of a scheme of the attorney to obtain from the Industrial Accident Board, or its successor, the Workers' Compensation Division, significant sums of money for claimants who were not lawfully entitled thereto. It is charged that the pattern of conduct reveal a gross disregard for the highest standards of honesty, justice and morality and that he had demeaned the profession and practice of law and brought discredit to the Bar.

The answer of the attorney admits he obtained medical reports of Dr. Hogan but denies otherwise every charge brought against him in count 11.

A considerable portion of the record before the Commission on Practice relates to the financial and physical condition of Dr. Hogan, during the time he was issuing medical reports for the clients of the attorney, and the doctor's deterioration as a medical professional by reason of his addiction to drugs. It is a sorry record. Out of respect to the doctor, we will not recite in detail what this record reveals, except to state the findings of the Commission on count 11 are fully substantiated in the following:

> ". . . Specifically, the Commission finds that
> respondent (attorney) knew that Dr. Hogan
> was seriously addicted to dangerous drugs
> and alcohol, which adversely affected his
> health, his ability to function as a competent
> medical practicioner, his moral judgment and
> that as a result thereof, Dr. Hogan was
> in dire financial straits. Respondent (attorney)

-19-

preyed upon the weaknesses and deficiencies of
this medical practitioner. The Commission
further finds respondent guilty of a pattern
of conduct consisting of deceit, collusion,
false representations, and lacking in candor
and fairness in his representation of clients
before the Workers' Compensation Division of
the State of Montana which would result in
exorbitant sums of money extracted from public
funds . . ."

We have nothing to add to those conclusions, nor could

they be better stated.

Applicable Law--Reasons For Accepting The

Commission Report

We start with the proposition that an attorney must

during the period of his authority to practice before the

Bar of this State so conduct himself that he evinces a good

moral character, a trustworthy nature and a true commitment

to fair dealing with his clients, and with others on behalf

of his clients. Fair dealing and honesty should be the

trademarks of an attorney. In the Matter of Paddock (1967),

150 Mont. 59, 430 P.2d 361. These are the qualities which

are essential for admission to the Bar, and if the attorney

lapses from or ceases to possess those qualities, he or she

is subject to our discipline, even to removal from the Bar.

In Re Hansen (1936), 101 Mont. 490, 54 P.2d 882.

The duty of an attorney is broader than that of a

trustee because the persons entitled to rely on the attorney

cover a broader range. A trustee is responsible to his

beneficiary, or persons claiming through his beneficiary, but

an attorney's responsibility runs to his clients, the Bar

itself, the court and the general public. His duty of

honesty and fairness toward all is at least that of a trustee,

however, in the sense we pointed out recently, quoting Mr.

Justice Cardozo:

"Not honesty alone, but the punctilio
of an honor the most sensitive, is the
standard of behavior." Meinhard v. Salmon
(1928), 249 N.Y. 458, 164 N.E. 545, 546,
547, 62 A.L.R. 1; Murphy v. Redland, et
al., (Cause no. 13941, decided August 22,
1978.)

-20-

That standard of duty applies to activities in and out of the profession, as this Court said in its Advisory Opinion to the Commission on Practice (1971), 159 Mont. 541, 495 P. 2d 1128:

> "Any acts committed by an attorney, contrary to the highest standards of honesty, justice or morality, including but not limited to those outlined in section 93-2026, [R.C.M. 1947], and the violations of duties outlined in chapter 91, Title 93, whether committed in his capacity as an attorney, or otherwise, may constitute cause for discipline."

Ultimately, the discipline of a member of the Bar falls upon this Court. We have that power and duty inherently and by virtue of constitutional provisions (1972 Mont. Const., Art. VII, §2). It was to aid us in the exercise of that power and the performance of that duty that the Commission on Practice was established in 1965. Once the Commission has made its report and findings to us, it is still our duty to weigh the evidence upon which the findings rest. We have done that in the preceding paragraphs. It is the burden of the attorney to demonstrate that the findings are not supported by the evidence or the recommendations are erroneous or unlawful. The attorney has the burden to show the charges are not sustained by convincing proof and to a reasonable certainty.

When, as here, the findings rest on testimonial evidence, we are reluctant to reverse the decision of the Commission, which is in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. See Zitny v. State Bar of California (1966), 51 Cal.Rptr. 825, 415 P.2d 521.

With that background, we proceed now to examine the legal contentions of the attorney in opposing report of the Commission.

In general, the attorney contends there was insufficient evidence before the Commission to establish the falsity of the medical reports and the attorneys knowledge of that falsity. It is also generally contended if the proof failed in those particulars, then the allegations in count 11, relating to the pattern of misconduct by attorney, must also fail, because the pattern cannot be established.

It is contended the evidence is insufficient to establish falsity of the medical reports and knowledge on the part of the attorney in that:(1) Dr. Hogan's testimony is "tainted"; (2) impeachment testimony was used as substantive evidence by the Commission; and (3) the Commission disregarded the testimony of the attorney himself in denying the allegations. It is also contended in connection with the falsity of the medical report the Commission should not have considered the evidence of Dr. Schemm. Regarding count 11, the pattern of misconduct, it is contended that the evidence is insufficient to establish background for all of the reasons foregoing and for the further reason that the evidence is insufficient to establish that Dr. Hogan was, at the time he was making the reports in question, addicted to drugs so as to affect his judgment in any way, or to establish he was in financial trouble.

It is further contended that because the testimony which was given before the Grand Jury and by affidavit of Dr. Hogan occurred outside the presence of the attorney or his representatives, that thereby the attorney has been denied the right to confront the witnesses, the right of cross-examination, and he has been denied procedural and substantive due process and the equal protection of the laws.

There are other contentions not directly related to the evidence which we will discuss later.

-22-

It is to be admitted the contention with respect to Dr. Hogan's testimony is a troublesome point. He testified before the Grand Jury in the Workers' Compensation investigation as we have indicated above; he repeated that testimony in an affidavit supplied for the investigators in that investigation. He told investigators for the Commission on Practice a story agreeing with his Grand Jury testimony. When he was testifying before the Commission he recanted his earlier statements to the Commission investigators and in effect testified against what he had stated before the Grand Jury. Thus, regarding Dr. Hogan's testimony, the Commission had before it a problem to determine when in fact Dr. Hogan was telling the truth. They resolved that problem by deciding he was being truthful in his testimony to the Grand Jury. Here, the rule that on testimonial evidence we will regard with great respect the findings of the Commission holds true. The members of the Commission, having an opportunity to observe the demeanor of the witnesses on the stand and to relate the other evidence of the case to the testimony being given by the witnesses, have reached conclusions which we do not think or find to be erroneous, much less clearly erroneous.

For the same reason, even though the attorney himself testified directly opposite the Grand Jury testimony of Dr. Hogan, it is clear the Commission, in judging the credibility of the attorney in relation to the totality of the evidence, found against him. Again, we agree with the conclusion of the Commission on this point. We find no basis upon which to set aside the findings of the Commission simply because the attorney himself denied the charges that were made against him. We recognize in so stating we are in effect accepting the "tainted" evidence of Dr. Hogan and rejecting the testimony of the attorney.

Our judgment is the Commission is supported by all of the facts and circumstances that appear in the evidence in this case.

Part of the totality of the evidence upon which we rely to sustain this judgment lies in the medical reports themselves. Most lawyers and judges have some experience with medical reports and have some knowledge of what they ordinarily contain in order to establish the conclusions reached by the medical persons involved. These reports, on their face, fall short of what practicing attorneys and trial judges would expect to find in such medical reports. While we are bound by the record evidence and the testimony relating thereto, as is the Commission on Practice, we are nonetheless in the same position as trial jurors: we are not bound to believe from the evidence what we would not otherwise believe as ordinary men and women, or in this case, as ordinary lawyers.

Turning to the evidence of Dr. Walter Schemm, once we accept the grand jury testimony of Dr. Hogan, and the falsity of the reports, the testimony of Dr. Schemm is merely cumulative in support of our judgment. However, Dr. Schemm's testimony is also very helpful in determining the falsity of the medical reports that were submitted from Dr. Hogan. The attorney attacked Dr. Schemm's testimony on the basis it is speculation and hearsay and an opinion based on an opinion, or perhaps an opinion based upon an opinion based upon an opinion. The attorney argues no expert should be allowed to advance an opinion as to what another man should observe (Pecos and N. T. Railway Company v. Coffman (Texas 1913), 160 S.W. 145, 149); that is error to ask a doctor whether he concurs or disagrees with the opinion of another doctor regarding the extent and nature of injuries (Galveston H & H 2 Railway Company et al. v. Alberti (Texas 1907), 103 S.W. 699); and

-24-

that opinions based upon opinions are improperly received in evidence and immaterial (Mount Royal Cab Company v. Dolan (Maryland 1935), 179 A. 54, 98 A.L.R. 1106). Those cases and other cases cited by the attorney in support of this contention are distinguishable from the issue in the case at hand. In those cited cases the issue was the extent of the disability of an injured person. The courts held in those cases that an expert should reach his own conclusions based upon his own observations of the injured person and that it was improper to allow the expert to testify as to whether or not his conclusion agreed or disagreed with another doctor. In this case, the issue is different, whether the medical reports submitted by Dr. Hogan, on their face, met acceptable standards or provided sufficient medical information to substantiate the conclusions that Dr. Hogan was drawing as to the disability the respective claimants suffered, and whether the disabilities were work related. In other words, the issue to be decided was not the actual injuries sustained by claimant, but whether the medical reports that Dr. Hogan prepared could be substantiated on the symptoms and histories he reported. Thus the issue here is entirely different, and the Commission followed a proper procedure in obtaining an expert to determine the validity of the conclusions set out in the Hogan reports.

The remaining question to be discussed with respect to the evidence is whether the Commission and this Court have the right to accept the Grand Jury testimony of Dr. Hogan as substantive evidence. While, as we have said, the totality of the evidence supports accepting the testimony of Dr. Hogan before the Grand Jury, it is obvious the Commission has accorded substantive status to the Grand Jury testimony. The attorney attacks this, saying that since the hearing was held in June

-25-

1977, before the adoption of the Montana Rules of Evidence, which became effective on July 1977, the law of this State at that time was that impeachment evidence could not be considered as substantive. He cites a number of cases, including Wise v. Stagg (1933), 94 Mont. 321, 330, 22 P.2d 308; State v. Kinghorn (1939), 109 Mont. 22, 39, 93 P.2d 964; Batchoff v. Craney (1946), 119 Mont. 157, 162, 172 P.2d 308; Siebel v. Byers and Yurick (1959), 136 Mont. 39, 48, 344 P.2d 129; and State v. Jolly (1941), 112 Mont. 352, 355, 116 P.2d 686.

The Commission admits in its brief that prior to Jolly, supra, previous inconsistent statements of a witness were admissible for impeachment purposes only and did not constitute substantive evidence. The Commission, however, contends Jolly is a cross-roads opinion because it is the last case which critically analyzed the permissible use of prior inconsistent statements. In Jolly, this Court said:

> "While the weight of authority would limit
> such evidence to the impeachment of the
> witness' subsequent testimony on the
> stand (2 Wigmore on Evidence, 2nd ed.,
> 459, sec. 1018), the better reasoning
> would seem to support the other view (3
> Wigmore on Evidence, 3rd ed., 687, sec.
> 1018), since the prior statement is not
> properly subject to objection as hearsay,
> the witness being present in court for cross-
> examination concerning it." 112 Mont. at
> 355, 116 P.2d at 688.

Two civil cases following State v. Jolly, supra, Batchoff v. Craney, supra, and Seibel v. Burns and Yurick, supra, adhered to the old rule instead of following the suggestion in Jolly that the better view permits the consideration of prior inconsistent statements as substantive evidence where the witnesses are present for cross-examination. However, in 3 subsequent criminal cases, State v. Longacre (1975), 168 Mont. 311, 542 P.2d 1221, State v. Borchert (1970), 156 Mont.

-26-

315, 479 P.2d 454 and State v. Mally (1961), 139 Mont. 599, 366 P.2d 868, the Court permitted and considered the use of prior inconsistent statements favorably to support criminal convictions.

With this background, the Commission on Rules of Evidence in proposing the new Rules of Evidence for this Court felt prior inconsistent statements were admissible as substantive evidence, and suggested for adoption, Rule 801(d)(1)(A), accordingly. This Court had approved those rules prior to the hearing hereunder, even though the effective date would not begin until July 1, 1977.

The foregoing cases would indicate the law in Montana on this point was in flux, but the Court was moving toward a change in the rule of Wise v. Stagg, supra. The matter is now settled with the adoption of the Montana Rules of Evidence. Such testimony is now clearly admissible for substantive purposes.

The testimony of Dr. Hogan was taken on May 7, 1977. In cross-examination before the Commission, Dr. Hogan testified that when he was being interrogated before the Grand Jury, he was lying. The Commission decided however, that when Dr. Hogan recanted before the Commission his Grand Jury testimony, he was actually lying before the Commission.

It is a syllogism beyond our grasp to agree with the attorney that the Commission could use Dr. Hogan's prior inconsistent statements before the Grand Jury to determine he was lying before the Commission but the Commission could not use that same testimony before the Grand Jury as substantive evidence to determine the gist of this case.

Dr. Hogan's testimony before the Grand Jury does not stand alone. It is buttressed, as we have said, by Dr. Schemm's testimony, by the inherent improbability of the reports themselves, and by the pattern of misconduct of the attorney which the evidence in this case establishes. But

-27-

even if Dr. Hogan's Grant Jury testimony did stand alone, it would be sufficient and could be considered as substantive by the Commission. This, because the attorney's authority to practice law is a continuing question, and a determination of this particular attorney's fitness to practice law, could have been considered by the Commission or this Court before or after July 1, 1977. What we are concerned with in discipline cases is the protection of the public. Strict rules of evidence cannot be used to defeat considerations of public welfare. In Re Wilson (1953), 76 Ariz. 49, 258 P.2d 433.

The attorney has contended that because Dr. Hogan's testimony was considered substantively by the Commission, the attorney hasbeen deprived of due process, procedural and substantive, and the equal protection of the laws. Apparently the attorney means by this that because Dr. Hogan testified before the Grand Jury in the absence of the attorney, with no possibility of cross-examination by the attorney, he has thereby been deprived of Constitutional rights. All due process requires however, is the attorney be given a fair hearing before the Commission. He has received this. Every opportunity has been given to him to establish the charges against him were not true. That the Commission chose to believe Dr. Hogan's testimony before the Grand Jury, rather than the testimony of the attorney and of Dr. Hogan before the Commission, is a matter relating to credibility and not to constitutional rights. If the attorney's contention on this point were to be sustained, it would in effect negate any use of prior inconsistent statements, in any case, because rarely are prior inconsistent statements uttered at a time when cross-examination is available, except in discovery depositions.

Other Contentions of the Attorney

We have considered other contentions raised by the attorney on which he argues the report of the Commission should not be accepted. Chiefly, the other contentions also relate to the testimony of Dr. Hogan, but 2 of the contentions relate to the Commission itself.

The additional contentions with respect to Dr. Hogan's testimony involve the claim that he was coerced by the investigators from the Attorney General's office to give his testimony before the Grant Jury by threats of prosecution and loss of his medical license. It is also contended by the attorney that at the time of the medical reports here in question, he was no longer addicted to drugs; and further his financial situation had improved so he was not dependent upon this attorney for a material contribution to his support arising out of the medical reports.

These contentions were before the Commission, which considered them, and by its decision rejected them. We do not find the Commission to be clearly erroneous in this respect. This is true also of the admission of exhibit No. 10, an affidavit which Dr. Hogan had given to the investigators corroborating his Grand Jury testimony.

The attorney contends it is improper for the chairman of the Commission on Practice to act as both the person in charge of the hearing, and as the trier of the facts. It is contended that instead of having the chairman determine rulings on evidence in hearings before the Commission, it would be proper that a law officer be appointed, to whom would be relegated the function of deciding matters of law and who would be prohibited from deliberations based upon the evidence.

In our order establishing the Commission on Practice (January 5, 1965, Cause No. 10910) we provided that the chairman of the Commission shall act as a presiding officer where the Commission on Practice itself conducted any hearing.

We see no prejudice accruing to the attorney arising out of this provision, or out of this fact that the Commission followed it in conducting the hearing. The decision of the Commission was unanimous which is a significant aid on this point to determine that no prejudice occurred.

During oral argument in this matter, it was contended by one of the counsel for the attorney, that the makeup of the Commission on Practice was such that it was "defense"

oriented, and that an attorney whose business related to a "plaintiff's" practice was not as likely to get a fair result from this Commission. We answer that contention in 2 ways: first, this Court has put it in the power of the Bar itself to determine who shall be the members of the Commission on Practice. We provided in our order establishing the Commission a term of 4 years for each member and further that the members shall be selected from lists of 3 attorneys elected by their peers in 8 different districts throughout this State. This Court has followed the practice of appointing the person who received the highest number of votes in each district. There has been no "stacking" of the Commission on Practice because the members of the Commission are determined by the Bar itself. Second, we interpret this statement about the members of the Commission as one not attacking their integrities, but rather their predilections. If the contention were meant as an attack on the integrity of the members, we would not countenance such an attack in the slightest or for a moment. If it is a comment upon their predilections, then we state that their basic integrity would require them in spite of any leanings they may have, to overcome such tendencies, and to decide this matter fairly and impartially, based upon the evidence they received. In our firm opinion, this is what the members of the Commission did.

As an offshoot from the foregoing contention, it was also contended by counsel for the attorney that the attorney in this case was simply "playing the game"; that is, plaintiff's attorneys have certain doctors to which they refer their clients for examinations and medical reports, and the defense attorneys in the same manner have conservative doctors whom they consistently use to obtain medical opinions that accord with their slant on the case. We are not blind to the fact that experts vary widely in their opinions, particularly in medical disability cases; and that lawyers, in representing their clients, will seek out experts more favorable to

-30-

their side of the case. As long as the experts so acquired express their honest convictions, true advocacy is thereby served. An entirely different issue is presented when the expert's opinions are dishonest, false or exaggerated, and the attorney with knowledge thereof submits such opinions to the trier of fact. Then the mills of justice are corroded. Permissible advocacy cannot in any sense be extended that far.

It is also contended we should take into consideration the fact the criminal indictments which were issued against the attorney were dropped. We were informed during oral argument that the State, after receiving the results of polygraph tests taken of the attorney, determined it could not prove the criminal charges against the defendant and so these were dismissed. These facts however, are no bar to our determination as to whether discipline should be applied to the attorney.

> "A state bar disciplinary proceeding may
> be maintained even though the accused
> attorney has been acquitted on criminal
> charges covering the same facts or
> has obtained a dismissal of such charges."
> Wong v. State Bar (Cal. 1975), 125 Cal.Rptr.
> 482, 542 P.2d 642.

The attorney raised a number of other arguments, but none significant enough to require comment here.

### Determination of Punishment

Fixing the punishment of the attorney in view of the charges against him has been a source of great difficulty in this case. The Commission on Practice recommended disbarment. Some members of the Court felt the record warranted following that recommendation. Other members of the Court felt consideration should be given to other factors, including these: the strongest evidence against the attorney is the "tainted" evidence of Dr. Hogan; other persons also involved in disciplinary proceedings arising out of the Workers' Compensation investigation have not been visited with disbarment; the abortive and controversial handling of the Workers' Compensation investigation itself; no dishonesty as between

-31-

the attorney and his clients was revealed; and no previous record exists involving this attorney in disciplinary matters since his admission in 1948. All members of the Court however, accept the findings of the Commission, as we have above stated.

Having in mind all of the factors above recited, and the record in this case, and mindful of our duty that the public in all events must be protected, and to demonstrate to our fellow attorneys the concern of this Court for the preservation of the high standards of conduct in our noble profession, it is the judgment of this Court that the attorney, Joseph M. Goldman, shall receive a public censure in open court on a date and at a time to be set hereafter, and that for a period of 3 months, commencing on the date of said censure, the said attorney shall be suspended and prohibited from the practice of law in any form.

### ADDENDUM

During the oral argument before the Court in this case, an incident occurred that marred the otherwise orderly proceedings.

Before the hearing, counsel for respondent contended the oral arguments were an extension of the proceedings before the Commission on Practice so that the right of privacy prevails. Therefore respondent petitioned for arguments to be heard in camera before the Court. There being no objection from opposing counsel, this Court ordered a private hearing. Reporters and others who had gathered in the courtroom were so informed, and they withdrew. However, 2 reporters stationed themselves in a hallway outside the courtroom, at an air vent that opened from the courtroom. There one reporter attempted to tape the oral arguments as they proceeded, and the other took notes of what he overheard. When their presence at the air vent was revealed to the Court, the oral arguments were interrupted and the two reporters were escorted into the well of the Court. There the Acting Chief Justice advised the reporters that any use

of the information gained by them through the vent was forbidden until the decision of the Court in this case. Later that day, a written order of the Court informed reporters that any such forbidden use of the information would be considered a contempt of the Court.

In first light, the attempt of the two reporters to thwart the purpose of the Court's order seems most inappropriate. However, we measure their actions considering their evident concern for the public's right to know. We are gratified the reporters have not used the information they overheard and have thereby avoided a confrontation with this Court that would be distasteful and undesirable. The occurrence however, requires the Court to state publicly again the reasons underlying the confidentiality that surrounds proceedings before the Commission on Practice.

It may be observed that perhaps more than in any other profession, the high repute of a lawyer is his only asset. Against the shocking revelations of lawyers' didoes in high places in recent years, there remains the solid fact that literally hundreds of thousand of lawyers in this country dutifully serve their clients in the conduct of their affairs. Still, a lawyer, otherwise reputable, might have his reputation smeared by unfounded charges or allegations.

There is no yardstick to measure the damage through loss of reputation done to a lawyer who is accused of unethical practices, either falsely, intemperately or sensationally. No retraction, withdrawal, or apology will restore his repute when, as in most cases, the accusations are found to be false or groundless.

Recognizing this, when the Commission on Practice was established by this Court, we provided a means to protect the lawyer's reputation as long as his reputation deserved to be protected, but no longer. This case is one in point. Here the factors that have led us to our decision today are spread out for the press to quote and the public to know.

The judicial process of dissecting the issues of fact and law and deciding the punishment could not have been adequately or fairly reported by the press if the proceedings had been open from the beginning. This fact does not spring from any intentional fault of the press, but from limitations over which it has no real control--limitations of space, manpower, proportion, legal expertise, and in the end, the limited news value of an individual lawyer's reputation, once the case has lost its sensational aspect.

On the other hand, had respondent been cleared by the Court of the charges against him, we would have deemed his right of privacy and reputation more important to the conduct of the business of the Court than publication of the fact that charges against him were found wanting. In other words, we hold that public confidence in the judicial system requires privacy in such proceedings, but that publicity is necessary when the lawyer is found guilty of serious transgressions.

In those cases (they are not numerous) where private censures of attorneys have occurred, the transgressions have not been serious and most usually have been the result of thoughtlessness not sufficient to warrant public condemnation. In the manner of theologians, we require publication and public punishment for transgressions of grave matter, sufficient reflection and full consent of the will.

We trust the press and public will grant we are determined to police effectually and resolutely the dealings of attorneys to assure the high standards of ethics to which we have pledged to the Bar.

The right of the press and therefore the right of the public to know the underlying business of the Court clashes in these instances with the right of our citizens to a fair and effective justice system, obtained through competent courts, aided by competent attorneys. As in all such cases involving great public issues, a careful balancing of the

rights of all parties is necessary. We have found such a
balance in providing privilege to the internal workings of
the Commission on Practice. We are no more willing to yield
that privilege than the press is willing to yield its claim
of right to protect its sources of information. Neither
side can fault the other for that.

_____
                    Justice

We Concur:


_____
              Justice

Hon. Leonard Langen
District Court Judge,
Sitting in for Mr. Chief
Justice Frank I. Haswell

Hon. M. James Sorte
District Court Judge,
Sitting in for Mr. Justice
Daniel J. Shea

Mr. Justice Gene B. Daly specially concurring:

I fully appreciate the problems attendant to the resolution of this case and must therefore concur in the result but not in all that has been said.

I have very strong feelings concerning the information given to this Court about the conduct of one Lawrence Taylor, special assistant prosecutor hired from California and active during the time the grand jury alluded to in this opinion was in session. His method of obtaining the testimony of Dr. Hogan, in the first instance, is nothing short of reprehensible and should not be condoned by the State of Montana. Taylor demonstrated his total lack of ethics at a televised news conference with the then attorney general on Friday, June 11, 1976, with his now infamous statement, "an incestuous relationship between some judges and some lawyers, etc." Then, he fled the State of Montana. This entire mess is so tainted it is difficult to imagine that any of its fruit be used, of all places, in a forum which is charged with the determination of a man's ethical quality.

I can find no better words than those used by Mr. Justice Holmes and Mr. Justice Brandeis in Olmstead v. United States (1927), 277 U.S. 438, 48 S.Ct. 564, 72 L.ed. 944, as they spoke of the acceptance of tainted evidence by the courts, i.e., the "silver platter doctrine":

> ". . . But there is another consideration--
> the imperative of judicial integrity. It was
> of this that Mr. Justice Holmes and Mr. Justice
> Brandeis so eloquently spoke in Olmstead v.
> United States, 277 U.S. 438, at 469, 471, more
> than 30 years ago. 'For those who agree with
> me,' said Mr. Justice Holmes, 'no distinction
> can be taken between the Government as prose-
> cutor and the Government as judge.' 277 U.S.
> at 470. (Dissenting opinion.) 'In a govern-
> ment of laws,' said Mr. Justice Brandeis,
> 'existence of the government will be imperilled

if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means --to declare that the Government may commit crimes in order to secure the conviction of a private criminal--would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.' 277 U.S., at 485. (Dissenting opinion.)" Elkins v. United States (1960), 364 U.S. 206, 222-23, 80 S.Ct. 1437, 1447, 4 L Ed 2d 1669, 1680-81.

_____
Justice

Mr. Justice John C. Harrison dissenting:

While I recognize the difficulty of the task before this Court and while I fully acknowledge the integrity of my brothers in meeting the challenge here presented, I respectfully dissent.

> "There is no profession, in which moral character is so soon fixed, as in that of the law; there is none in which it is subjected to severer scrutiny by the public. It is well, that it is so. The things we hold dearest on earth,--our fortunes, reputations, domestic peace, the future of those dearest to us, nay, our liberty and life itself, we confide to the integrity of our legal counsellors and advocates. Their character must be not only without a stain, but without suspicion." (Emphasis added.)

G. Sharswood, Essays on Professional Ethics (1854), reprinted in Selected Readings on the Legal Profession, assembled by a committee of the Association of American Law Schools (1962).

Disciplinary proceedings inevitably bring to mind the oft-quoted words of Justice Cardozo:

> ". . . Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. [Citation omitted.] Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." Meinhard v. Salmon (1928), 249 N.Y. 458, 164 N.E. 545, 546.

As has been noted often enough, this language is cited when the boom is lowered on the offending fiduciary--and let us not forget that, by definition, an attorney is a fiduciary--but is conspicuously absent when the offense is

-38-

deemed absent, too. Nonetheless, this is the standard which shines as our polestar and guides us through the moral morasses, which disciplinary proceedings inevitably become.

The majority opinion recites and adopts the factual findings of the Commission on Practice. I have no quarrel with the adoption of the findings, and the majority opinion is well done in this respect. But after wholeheartedly concurring in the findings, the majority then discards the recommendation of disbarment made by that same Commission. With this rejection of the recommendation of disbarment I take exception.

It has been recognized that there is a great reluctance on the part of courts to impose discipline.

> "This . . . is understandable. It is in these proceedings that the human side of the judge appears most strikingly. Judges are lawyers. Many of them have recently been practicing at the bar. They know something of the temptations from which they have been removed by elevation to the bench. They have maintained friendships, social and sometimes political, with many practicing lawyers. It is a painful task to sit in judgment upon the conduct on one's friends. Theirs is the final word. The grievance committee proposes, but the court must dispose. Its duty is, therefore, the most unpleasant to perform.

> "Moreover, there seems to persist a strange confusion as to the nature of disciplinary proceedings. Over and over the courts have stated that the end and purpose of such proceedings, particularly where disbarment is under consideration, is not punishment of the offender, but protection of the public. Yet somehow the idea of punishment creeps in." McCracken, The Maintenance of Professional Standards: Duty and Obligation of the Courts, 29 S.Cal.L.Rev. 65, 73 (1955).

This Court has repeatedly confirmed the principle that discipline of a wayward attorney is for the protection of the public. In In re Peters (1925), 73 Mont. 284, 288, 235 P. 772, 774, for example, we stated:

> "The purposes of removal of an attorney are to purge the profession of those who lower its high standards and bring an honorable calling into disrepute and contempt, and to protect the public at large, and the courts, from the acts of the unscrupulous. As was said in Re Thresher, 33 Mont. 441, 114 Am. St. Rep. 834, 8 Ann. Cas. 845, 84 Pac. 876: 'This proceeding is in no sense a criminal prosecution, nor is it in aid of a criminal investigation. Its purpose is to ascertain whether the accused is worthy of confidence and possessed of that good moral character which is a condition precedent to the privilege of practicing law and of continuing the practice thereof. * * * '"The end to be attained is not punishment, but protection."'"

Repeatedly it has been said that, by admitting an attorney to practice, a court endorses him to the public as worthy of their confidence in professional matters, and if he becomes unworthy, it is the duty of the court to withdraw the endorsement. We have committed ourselves to this: "'[T]here is no duty imposed upon a court more important than that of preserving to the best of its power and ability the professional integrity and purity of its bar.'" (Emphasis added.) In re Young (1926), 77 Mont. 332, 347, 250 P. 957, 962. There, too, we said:

> "'The position of an attorney and counselor at law is that of an officer of the court. His relation to the court, the bar, and the public is one of trust and confidence. To his integrity and ability are not infrequently intrusted the lives, the liberty, and property of the citizen. Years of time, arduous labor, and constant application are required to elevate him to that professional standing which enables him to discharge with fidelity the responsible duties intrusted to his care. If dishonest practices and unprofessional conduct have caused him to forget his obligations, and lead him to a violation of the sacred trust, his name should be stricken from the roll, and he should be removed from a place in the ranks of the profession which he is found unworthy to fill.' (In re Catron, 8 N.M. 253, 43 Pac. 724.)" 77 Mont. at 347-48, 250 P. at 962.

With regard to disbarment, intended to protect the public, McCracken offers these noteworthy observations:

"Herein lies the essential foundation upon which
rests the entire structure of the bar. In no
other field, save perhaps that of the clergy,
does a man bear so powerful an endorsement when
he enters into the practice of his vocation.
The court, undoubtedly the most respected offi-
cial body in American life, has carefully ex-
amined into this man's character and is prepared
to advise the public that he is worthy of con-
fidence. His clients rely upon that endorse-
ment, consciously or unconsciously. So does the
bar; so do the courts themselves. If he proves
himself unworthy of this confidence, there is
only one thing to do--that is revoke his license.
The practice of the law is a privilege, and while
it has been said that privilege may ripen into
a property right, it is nevertheless a right
which is held in sufferance. It may be lost by
misuse." 29 S.Cal.L.Rev. at 75.

Although "[p]rotection of the public, and nothing else,

lies at the basis of [disbarment]" and although "this doc-

trine is the sole justification for discipline of a lawyer

for actions other than contempt of court,"

"[t]his philosphy has not always been followed.
Indeed, the leniency of courts, even in the
face of well-supported recommendations by the
examining committee or board, has become almost
proverbial." 29 S.Cal.L.Rev. at 75.

This Court should not aid in the making of such a proverb,

especially in the face of a well supported recommendation

such as that made by the Commission in this matter.

McCracken quotes this penetrating observation:

"'The recommendations of the Board of Governors
[a body similar to Montana's Commission on Prac-
tice] represent the judgment of an experienced
body of representative lawyers, familiar from
daily contact with the conditions of practice
and the standards of conduct currently prevailing
at the bar. Judges of the Supreme Court, sepa-
rated from practice by long terms not only in
their own court but often in courts below, cannot
possibly have the same intuitive judgment as to
degrees of misconduct, or know so well the criti-
cal reaction of the bar, or of public opinion.
Such judges are not likely to be able so well to
discern in the particular dereliction a reflec-
tion of some general evil; nor are they so com-
petent to estimate the effect of a particular
penalty either on the individual attorney ac-
cused or as a check upon the more general evil,
when such evil exists.'" 29 S.Cal.L.Rev. at 76.

The reasons advanced above are sufficient to commend this Court to follow the recommendations made by the Commission in the matter before us.

I believe that the majority opinion fails to give credit where credit is due. The Commission attorneys who investigated this matter spent many trying hours in pursuit of the truth of the allegations and charges, and doubtless spent much time fashioning a recommendation which would fairly comport with the findings. I would defer to the recommendations of the Commission, in the absence of egregious error unsupported by the record, much as Court defers to the district courts in the absence of manifest error. The majority acknowledges that as well, for it proclaims reluctance to reverse the decision of the Commission, "which is in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony." It is precisely because that _is_ the best possible reason for relying on the Commission's recommendation that I would adopt it and disbar appellant Goldman.

The following observation is meet:

"Every representative of a grievance committee or examining board who has appeared more than once before a court with a recommendation for disbarment has had the experience of finding the court in a hostile frame of mind and inclined to impose upon him the burden of persuading it. Of course, that should not be the case. When a group of members of the bar has performed the painful duty, often at great sacrifice to themselves, it would seem that the court would be in frame of mind to accept their recommendations unless persuaded otherwise by the offending lawyer. Curiously enough, more frequently than not, this is not the attitude of the court. Rather, it appears to assume the attitude that a man is being persecuted by his fellow lawyers and that he needs the court's assistance and protection." 29 S.Cal.L.Rev. at 77.

Again, it is the _public_ which is in need of protection, and it is the court which ultimately provides the protection in policing those who are its officers. Yes, it would seem that a court would be in a frame of mind to accept the recommendations made by the members of the Commission, members of the bar who have performed a painful duty. This Court should accept the recommendation of disbarment, for appellant Goldman has not persuaded it to do otherwise.

As a prelude to the Canons of Professional Ethics, which govern the conduct of all attorneys admitted to practice in this state, we have said:

> "The Supreme Court of Montana recognizes that the stability of courts and of all departments of government rests upon the approval of the people. The future of those engaged in the practice of law depends upon the maintenance of absolute confidence in the integrity of the Bar and the efficient and impartial administration of justice. This cannot be accomplished unless the conduct and motives of lawyers are such as to merit the approval of all just men."

These remarks mesh with the policy that disbarment of an errant attorney is for the protection of the public. Unless we keep clean our own house--and "[i]f the house is to be cleaned, it is for those who occupy and govern it, rather than for strangers, to do the noisome work," People ex rel. Karlin v. Culkin (1928), 248 N.Y. 465, 162 N.E. 487, 493 (Cardozo, C.J.)--we cannot expect the public to have confidence in the integrity of the bar and in our system of justice.

"The attitude of the public toward the [legal] profession is not friendly[.]" L.R. Patterson and E.E. Cheatham, The Profession of Law 50 (1971). That understatement is underscored by D. Melinkoff in The Conscience of a Lawyer 15 (1973): "[T]he mystery is not that people hate lawyers, but that there are any left to hate."

All attorneys are bound by Canon 9 of the Code of Professional Responsibility, which mandates that "a lawyer should avoid even the appearance of impropriety." The first ethical consideration articulated by the American Bar Association in conjunction with this canon urges lawyers to promote confidence in our legal system and in the profession so the public may have faith that justice can be obtained within our government of laws. Again, we hear the theme of the public good, of protecting the public and the system which all lawyers have sworn to serve as persons of integrity and good moral character. It has been said time and time again; one court has phrased it thus:

> "No matter how learned in the law a man may be, nor how skillful he might be in the conduct of suits at law, or equity, he can never be admitted to the bar until he can satisfy the court that he possesses that first requisite to admission to the bar, a good moral character. Such character he must have when he knocks at the door of the profession for admission, and such character he must have while enjoying the privilege and right to remain within the fold. When he ceases to be a man of good repute, he forfeits his right to continue as a member of the bar." (Emphasis in original.) Ex parte Thompson (1933), 228 Ala. 113, 124, 152 So. 229, 238, 107 A.L.R. 671, 684.

The majority opinion recites that the members of the Commission, having observed the witnesses on the stand, reached conclusions which are not erroneous, much less clearly erroneous. It is acknowledged and affirmed by the majority that the Commission found against appellant Goldman, that the Commission, in judging the credibility of Goldman, found against him. As the majority itself states, simply because Goldman denied the charges made against him is no basis on which to set aside the findings of the Commission. Our judgment, says the Court, is that the Commission is supported by all the facts and circumstances in this case. With this, I thoroughly agree.

The majority firmly opines that the members of the Commission decided the matter "fairly and impartially, based upon the evidence they received." I join in that assessment. It is clear that the members performed a difficult task with the utmost integrity, with fairness of mind and with decency and sensitivity. Their findings have been accepted by this Court; logic dictates that their recommendation cannot thereafter be disregarded.

The Court expresses concern for the "tainted" evidence of Dr. Hogan; yet the Court accepts in toto the findings of the Commission, whose members observed the demeanor of both Hogan and Goldman and chose to find against Goldman. The majority expresses concern that other persons involved in disciplinary proceedings arising out of the Workers' Compensation investigation have not been visited with disbarment; but it must be remembered that each case is decided individually, and properly so. Surely it is illogical and unjust and contrary to our principles of fair play to proclaim that because others have been disbarred, the one more lately before the court, deserving or not, should be disbarred because the others were; it is quite as illogical and unjust and contrary to our principles of fair play to say that because no one else has been disbarred, a person who merits disbarment should not be disbarred. Each case is different; each must be decided on its own unique facts. The facts of this case dictate that the Commission's recommendation be adopted and enforced by this Court. As in State ex rel. Hartman v. Cadwell (1895), 16 Mont. 119, 133, 40 P. 176, 181,

> "[t]he question presented by this proceeding is not whether the respondent is guilty of a crime of which he has been or ought to be convicted,

but whether, under all the facts of the case, he is a fit person to be permitted to practice as an attorney and counselor at law in this state."

The majority opinion expresses concern about "the abortive and controversial handling of the Workers' Compensation investigation itself". Intending no disrespect, I submit that the handling of that investigation has no relevance to this, a disciplinary proceeding of a member of the state bar.

Again, with no disrepect, I take exception to the concern for the lack of revelation of dishonesty between the attorney and his clients. There is ample evidence of dishonesty elsewhere in Goldman's dealings in his capacity as an attorney. I repeat, with due credit to Mr. Chief Justice Sands, if a lawyer is not an honest man, he will not be an honest attorney, and honesty is an essential qualification for admission to and remaining in the bar. The bar, indeed the system of justice, cannot afford to have dishonest men practice under its banner, and the public is entitled to insurance that dishonest men are not knowingly, under sanction of the bar and with the apparent blessing of this Court, permitted to prey upon it. In Re Hansen (1936), 101 Mont. 490, 503, 54 P.2d 882, 888 (Sands, C.J., dissenting).

Finally, the majority opinion notes that the attorney has no previous record of disciplinary action taken against him. We have heard such arguments before and have dismissed them. "[A] spotless reputation is no defense for [an offense], where the proof establishes it as a fact." In re Wellcome (1899), 23 Mont. 450, 471, 59 P. 445, 453. Notwithstanding a clean record, if the evidence points to professional violations, as it does in this case, then the findings

must comport with the evidence. As a defense, a lack of a prior record here cannot withstand the overwhelming evidence of professional impropriety on the part of Joseph Goldman. This Court has always adhered to the dictum that a condition precedent to the privilege of practicing law and of continuing in the practice is possession of good moral character such that the practitioner is worthy of confidence placed in him by the public and by the courts and their officers.

> "A character for honesty and integrity is as necessary, to justify his retention of the privilege after he has acquired it, as it was to acquire it in the first place; and when his conduct is such that he has forfeited his right to the confidence of the public, he has forfeited his right to the privilege also." In re O'Keefe (1918), 55 Mont. 200, 204, 175 P. 593, 594.

When it becomes evident that one enjoying the privilege of practicing law is unworthy of that confidence and no longer possesses that good moral character, it is the duty of this Court to remove that individual.

> "[I]t has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed. The power, however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be as scrupulously guarded and maintained by the court, as the rights and dignity of the court itself." Ex parte Secombe (1856), 60 U.S. (19 How.) 9, 13, Chief Justice Taney delivering the opinion of the Court.

Almost a century ago, the Pennsylvania Supreme Court explained:

> "An attorney-at-law sustains an important relation in the administration of justice. He possesses certain powers and privileges from which others are excluded, and assumes impor-

tant duties and obligations towards both court
and client.  He is an officer of the former,
and a representative of the latter.  His posi-
tion is so responsible, his opportunites for
good and for evil are so many that both statute
and common law have united in throwing all
reasonable safeguards around his conduct.  Be-
fore he can be admitted to the bar, the [Court]
requires him to take an oath or affirmation,
inter alia, that he will behave himself in the
office of attorney within the court, according
to the best of his learning and ability, . . .
The court also requires satisfactory evidence
or proper knowledge of the law, and of the good
moral character of the applicant.

"The power of a court to admit as an attorney
to its bar, a person possessing the requisite
qualifications, and to remove him therefrom
when found unworthy, has been recognised for
ages and cannot now be questioned.  In fact
the power of removal for just cause is as neces-
sary as that of admission for a due administra-
tion of law.  By admitting him the court pre-
sents him to the public as worthy of its confi-
dence in all his professional duties and rela-
tions.  If afterwards it comes to the knowledge
of the court that he has become unworthy it is
its duty to withdraw that endorsement, and
thereby cease to hold him out to the public
as worthy of professional employment."   In re
Samuel Davies (1880), 93 Pa. 116, 120-21.

This Court has said likewise, quoting Lord Chief Justice

Cockburn, In re Hill, L.R. 3 Q.B. 543:

"'When an attorney does that which involves
dishonesty, it is for the interest of the
suitors that the court should interpose and
prevent a man guilty of such misconduct from
acting as attorney of the court. * * *  I
should add, there is one consideration I omit-
ted, and which I think is entitled to great
weight.  It is that put to us in the course of
the discussion, namely, that if these facts
had been brought to our knowledge upon the ap-
plication for this gentleman's admission, we
might have refused to admit him; and I think
the fact of his having been admitted does not
alter his position.  Having been admitted, we
must deal with him as if he were now applying
for admission; and as, in the case of a person
applying for admission as an attorney, we should
have considered all the circumstances, and either
have refused to admit or have suspended the ad-
mission for a certain time, so, where a person
has once been admitted, we are bound, although
he was not acting in the precise character of
an attorney, to take notice of his misconduct.'"
In re Wellcome (1899), 23 Mont. 213, 225, 58
P. 47, 51-52.

Justice Cardozo phrased the concept thus:

"Membership in the bar is a privilege burdened
with conditions. A fair private and profes-
sional character is one of them. Compliance
with that condition is essential at the moment
of admission; but it is equally essential after-
wards. [Citations omitted.] Whenever the con-
dition is broken the privilege is lost. To
refuse admission to an unworthy applicant is
not to punish him for past offenses. The ex-
amination into character, like the examination
into learning, is merely a test of fitness. To
strike the unworthy lawyer from the roll is not
to add to the pains and penalties of crime. The
examination into character is renewed; and the
test of fitness is no longer satisfied. For
these reasons courts have repeatedly said that
disbarment is not punishment. [Citations omit-
ted.]" In re Rouss (1917), 221 N.Y. 81, 116
N.E. 782, 783.

See also Application of President of Montana Bar Ass'n

(1974), 163 Mont. 523, 525, 518 P.2d 32, 33.

I quote these legal authorities at great length to

emphasize what may be summarized thus:

"Consider for a moment the duties of a lawyer.
He is sought as counselor, and his advice comes
home, in its ultimate effect, to every man's
fireside. Vast interests are committed to his
care; he is the recipient of unbounded trust
and confidence; he deals with his client's
property, his reputation, his life, his all.
An attorney at law is a sworn officer of the
court, whose chief concern, as such, is to aid
in the administration of justice. In addition,
he has an unparalleled opportunity to fix the
code of ethics and to determine the moral tone
of the business life of his community. Other
agencies, of course, contribute their part,
but in its final analysis, trade is conducted
on sound legal advice. Take, for example, a
commercial center of high ideals, another of
low standards, and there will invariably be
found a difference between the bars of the two
localities. The legal profession has never
failed to make its impress upon the life of the
community. It is of supreme importance, there-
fore, that one who aspires to this high posi-
tion should be of upright character, and should
hold, and deserve to hold, the respect and con-
fidence of the community in which he lives and
works. [Citations omitted.]

"'No profession,' says Mr. Robbins in his Ameri-
can Advocacy, 251, 'not even that of the doctor
or preacher, is as intimate in its relationship

with people as that of the lawyer. [T]o his
lawyer he unburdens his whole life, his busi-
ness secrets and difficulties, his family rela-
tionships and quarrels and the skeletons in
his closet.  To him he often commits the duty
of saving his life, of protecting his good name,
of safeguarding his property, or regaining for
him his liberty.  Under such solemn and sacred
responsibilities, the profession feels that it
owes to the people who thus extend to its mem-
bers such unparalleled confidence the duty of
maintaining the honor and integrity of that pro-
fession on a moral plane higher than that of
the merchant, trader or mechanic.'"  In re
Farmer (1926), 191 N.C. 235, 131 S.E. 661, 663.

My position here and that of Mr. Chief Justice Sands in

In re Hansen, 101 Mont. at 503-04, 54 P.2d at 888, bear some

comparison.  He offered this explanation for his dissent:

the findings of the majority were such that, if correct,

showed the lawyer to be unfit for the duties of an attorney.

Yet, even with such findings the Court recommended a "penalty

. . . wholly inadequate".  101 Mont. at 504, 54 P.2d at 888.

The penalty recommended by this Court, too, is inadequate

given the findings of fact which have been made.  I would

act on the Commission's recommendation and disbar Joseph

Goldman.

John Conway Harrison
Justice